IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CV-593-FL

| | | |
|---|---|---|
| TROY K. WEAVER, and K.W., a minor, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| CARY ACADEMY, | ) | |
| | ) | |
| Defendant. | ) | |

This employment discrimination and civil rights action is before the court upon defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (DE 18). The motion has been briefed fully, and the issues raised are ripe for ruling. For the following reasons, defendant's motion is granted.

## STATEMENT OF THE CASE

Plaintiffs commenced this action on November 9, 2020, and filed the operative amended complaint on November 13, 2020, asserting claims for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981, and Titles I, III, and V of the Americans with Disabilities Act ("ADA"), and for breach of contract under state law. Plaintiffs seek reinstatement of plaintiff Troy K. Weaver ("Weaver"), compensatory damages, attorneys' fees and costs, and an injunction against further racially discriminatory or retaliatory employment action and further discrimination on the basis of disability, which also directs defendant to institute certain policies to provide equal opportunities.

Defendant filed the instant motion to dismiss for failure to state a claim upon which relief can be granted. In support, defendant relies upon a copy of plaintiff Weaver's charge of discrimination filed with the Equal Employment Opportunity Commission ("EEOC") and the declaration of Michael Ehrhardt ("Ehrhardt"), defendant's head of school, with an appended February 15, 2019, letter to plaintiff Weaver ("Offer Letter") and a May 10, 2019, letter to plaintiff Weaver ("Termination Letter").

## STATEMENT OF FACTS

The facts alleged in plaintiffs' amended complaint may be summarized as follows. Plaintiff Weaver, "who is Black," was an "Upper School science teacher" at defendant's school during the relevant time period. (Compl. ¶ 19).[1] His minor son, plaintiff K.W., attended defendant's school as a student during this time.

Plaintiffs allege that since the beginning of Ehrhardt's tenure in July 2012, "the culture of the school began to change," such that "[d]iversity and inclusion were no longer a prominently articulated goal" and "Black staff, students, and families began to feel marginalized." (See Compl. ¶¶ 19-21, 23). For example, on February 15, 2016, plaintiff Weaver was serving as the faculty member in charge of "3:15 dismissal and ensur[ing] safety for students with traffic flow and pick-up." (Id. ¶ 26). During that dismissal period, one car was obstructing the flow of traffic, which caused plaintiff Weaver to go over and speak to the driver. (Id. ¶ 27). The driver, a parent of a student, refused to make eye contact with plaintiff Weaver or move forward to assist traffic flow and informed plaintiff Weaver "that 'if [he] had a problem with it [he] could see . . . Ehrhardt." (Id. ¶¶ 28-29 (alterations in original)).

---

[1] For ease of reference, the court references "Compl." to mean the operative complaint: plaintiffs' amended complaint filed November 13, 2020. (Am. Compl. (DE 7)).

2

Because this incident "upset and disturbed plaintiff" Weaver due to "the lack of respect and courtesy shown him as a teacher at the school," plaintiff Weaver raised the incident with the head of the upper school, Heather Clarkson ("Clarkson"), who promised to talk to the parent-driver. (Id. ¶ 30). Clarkson "requested an apology from the parent, but the parent . . . refused to apologize for his interactions with [p]laintiff Weaver." (Id. ¶ 32). Plaintiff Weaver and Ehrhardt met to discuss the incident, but Ehrhardt was allegedly dismissive and unhelpful and failed to follow-up on the issue. (See id. ¶ 34).

In November 2017, at a "Voices of a Minority" session that was part of the staff's week of professional development, attended by Ehrhardt, plaintiff Weaver recounted his "experience involving the parent and the pick-up situation" as a "school situation in which [he] felt as though [his] voice [was] in the minority." (See id. ¶¶ 35-36). Plaintiffs allege that plaintiff Weaver hoped that recounting the situation would let Ehrhardt know that plaintiff "Weaver still felt upset and marginalized by the experience" and "would prompt further dialogue about the incident." (Id. ¶ 37). Ehrhardt allegedly "sat stoically as [plaintiff] Weaver recounted his experience," but "never approached [plaintiff] Weaver after . . . to discuss the experience or Weaver's feelings of marginalization due to the incident." (Id.).

In another alleged incident, defendant's administration failed to inform plaintiff Weaver of a time change for a Wake County Educators session that included a ceremony awarding "Teacher of the Year." (Id. ¶ 38). This resulted in plaintiff Weaver missing the presentation of the award, which he had in fact won. Further, this achievement was not recognized or lauded by Clarkson or the administration, despite similar treatment for previous winners.

Plaintiffs allege that plaintiff K.W. suffered similar feelings of marginalization, isolation, and a lack of respect. When plaintiff K.W. began attending defendant's school in sixth grade, he

was "one of two Black males" in the grade. (Id. ¶ 41). In April 2016, plaintiff K.W.'s seventh-grade year, he "was diagnosed with a congenital heart condition called hypertrophic cardiomyopathy," which precluded his participation in competitive sports, due to his doctor's recommendation. (Id. ¶ 42). In spring of 2017, plaintiff K.W. became "the only Black male in the 9th grade class" when his classmate and best-friend left for another school and defendant did not admit any other black male students into plaintiff K.W.'s class. This caused plaintiff Weaver concern, so he scheduled a meeting with Ehrhardt, but Ehrhardt allegedly was uninterested and unconcerned. Plaintiff K.W. struggled academically, emotionally, and socially during that year.

The combination of his diagnosis of hypertrophic cardiomyopathy and feelings of isolation resulted in plaintiff K.W. being "referred . . . to counseling and . . . formally diagnosed with depression." (Id. ¶ 48). Plaintiff K.W.'s depression diagnosis was shared with certain members of defendant's administration, including the upper school counselor, but she did not follow-up with plaintiff K.W. Plaintiff Weaver then met with all of his son's teachers regarding plaintiff K.W.'s depression and to ask for their assistance in enabling plaintiff Weaver to provide parental support, specifically, including that plaintiff Weaver be informed of any assignments plaintiff K.W. failed to turn in.

Plaintiff K.W. was also assigned a "[l]earning specialist," Laura Werner ("Werner"), to assist with his academic struggles. (Id. ¶ 50). However, Werner verbally questioned plaintiff K.W. in front of others if "he had really written [an English assignment] himself." (Id. ¶ 51). Plaintiff Weaver met with the upper school head to express his disappointment over this incident, and Werner apologized to plaintiff K.W.

Around this time, plaintiff K.W. received a failing grade in Spanish. Plaintiff Weaver had personal knowledge of the school's policy that a student could not "receive an 'F' on his/her report

card unless there ha[s] been communication with the parents and formal teacher intervention to provide student support," which had not happened in plaintiffs' case.  (Id. ¶ 56).  Members of defendant's administration promised to look into the situation but failed to follow-up with plaintiff Weaver.

Defendant's men's basketball team held tryouts in fall of 2018.  Plaintiff K.W. attended the second day of tryouts and falsely informed an assistant coach that he had received the requisite medical clearance to play, but plaintiff Weaver was actually still in discussion with his son's doctor about the possibility of plaintiff K.W. rejoining sports if he received a "internal cardiac defibrillator." (Id. ¶ 60).  On October 31, 2018, plaintiff K.W. made it through the first series of "cuts" and revealed this to his father, who was previously unaware of his son trying out. (Id. ¶¶ 61-62).  Plaintiff K.W. requested that he be allowed to tryout in the final session "just . . . to know that he was 'good enough' to make the team."  (Id.).  Plaintiff Weaver acquiesced, and plaintiff K.W. was allowed on the team, although he informed the coach that he could not accept the position.

Defendant's athletic director reached out to plaintiff Weaver to let him know that plaintiff K.W. could not play, with which plaintiff Weaver concurred, although he shared the possibility of the internal cardiac defibrillator.  While nothing was communicated to plaintiff Weaver at that time and no measures were taken against plaintiff Weaver, a nurse of defendant's had informed defendant's administrative personnel of her concerns regarding plaintiff K.W. playing despite medical advice to the contrary.  The upper school head indicated to that nurse that he would review the situation.

On February 15, 2019, plaintiff was offered a contract for the 2019-2020 school year, which he accepted by signing and returning it to Ehrhardt's office on February 28, 2019.

Also, in spring of 2019, plaintiff K.W. was assigned to attend a foreign exchange program in Pilar, Argentina, for which the family had obtained a passport for plaintiff K.W. in anticipation. As part of the program, before plaintiff K.W. left for Argentina, plaintiffs hosted an exchange student. They moved to a larger home, in part, to host the student and purchased certain materials in order to properly host the student.

The program purported that "exchange coordinators will work with families of students with disabilities . . . to discuss what types of accommodation are available . . . and to determine whether the student's needs can be met in a way that allows him or her to have a safe and positive experience abroad." (Id. ¶ 71). The coordinator for the Pilar exchange program and relevant school administrator "indicated that [plaintiff] K.W. could safely travel to Argentina and allowed his participation in the exchange program." (Id. ¶ 73). Defendant's nurse had indicated that an automatic electronic defibrillator could be sent along with plaintiff K.W. on the trip and that the faculty chaperones could be trained to use it.

However, on April 16, 2019, plaintiff Weaver received an email requesting a meeting based on plaintiff K.W.'s "medical flag." (Id. ¶ 79). Two days later, plaintiff Weaver was informed that his son would not be permitted to travel due to the purportedly arduous nature of the trip and lack of automatic electronic defibrillators in the places to which the students would travel. Plaintiff Weaver asked if an automatic electronic defibrillator could be sent with his son but was told it could not be.

Plaintiff Weaver, by chance, ran into Ehrhardt after learning of this decision. Plaintiff Weaver shared the details of the discussion he had just had. Ehrhadt informed plaintiff Weaver that plaintiff K.W.'s "basketball tryout . . . was [the] rationale for the school's decision." (Id. ¶ 91). Ehrhardt recounted that another student had become ill during an exchange trip the previous

6

year, which he explained further necessitated "the school's cautious approach with students having a medical occurrence/need so far from home." (Id. ¶ 94). Plaintiffs were upset and hurt by plaintiff K.W.'s exclusion from the trip.

Plaintiff Weaver sought an official letter on this decision and defendant's decisionmaking process. Plaintiff Weaver was informed by Ehrhardt, in an email copying defendant's human resources director and chief financial officer, that the two had much to discuss and that they would talk soon.

On May 3, 2019, plaintiff Weaver met with Ehrhardt and defendant's chief financial officer. Plaintiff Weaver was informed that he had failed to turn in a permission form related to the trip in a timely manner, despite the fact that others had also turned their forms in late. However, Ehrhardt explained that defendant would have allowed him to turn in the form late. The conversation turned "antagonistic," with both parties accusing the other of wrongful conduct. (See id. ¶¶ 100-09). Ehrhardt informed plaintiff Weaver that "he was considering termination of [p]laintiff Weaver and rescinding the contract that was offered and signed 3 months earlier." (Id. ¶ 110). Around this time, the stress and disappointment regarding his exclusion from the trip caused plaintiff K.W. to have "a meltdown that necessitated his being taken . . . to Wake Med Children's Hospital for a psychological assessment." (Id. ¶ 111).

Plaintiff Weaver, Ehrhardt, and defendant's chief financial officer met again on May 10, 2019. Ehrhardt informed plaintiff Weaver that defendant had decided "to 'end [plaintiff Weaver's] relationship with Cary Academy." (Id. ¶ 116). Ehrhardt explained that he had reflected on "this 'episode,'" and that this was the correct result based on similar situations prior. (Id.). Ehrhardt took issue with plaintiff Weaver's purported "breach" of "the 'safety and well-being of their students,'" by allowing his son to try out for basketball. (Id. ¶ 118-19). Ehrhardt also stated that

7

plaintiff Weaver did not have "a stellar and perfect track record around meeting professional obligations."  (Id. ¶ 118).  The "smooth path for [plaintiff] Weaver's exit was revocation of the offer letter . . . but not an immediate termination" along with the possibility of completing "summer work." (Id. ¶¶ 120-21).  Plaintiff Weaver was offered a severance agreement, and plaintiff K.W. would be allowed to continue at the school.

Plaintiff's termination letter stated that the February 18, 2019, contract offer was rescinded "after 'reviewing [plaintiff Weaver's] professional conduct regarding the health and safety of a student this academic year, and considering previous incidents involving general disregard for school protocol and policies." (Id. ¶ 124; see also Termination Letter (DE 20-2) at 2).  The letter described plaintiff Weaver's conduct as "gross malfeasance as it pertain[ed] to [his] duty of care and professional responsibilities" and focused on plaintiff Weaver's allowing his son to try out for the basketball team "despite his serious medical condition that could have resulted in his immediate death." (Compl. ¶ 125; see also Termination Letter (DE 20-2) at 2).  Plaintiff Weaver alleges, in contrast to the assertion of prior incidents involving general disregard for school protocols and policies and a lack of care for student safety, he had been "given multiple responsibilities which involved his being entrusted with the safety of Cary Academy students." (Compl. ¶ 127).

On June 8, 2019, after his alleged termination, plaintiff Weaver applied to a similar position as a science teacher at another school in Raleigh, North Carolina.  Plaintiff Weaver was familiar with the teacher who was leaving the position and was informed by that individual that plaintiff Weaver would be a good fit.  However, Ehrhardt's negative remarks to the new school's principal regarding plaintiff Weaver resulted in the school not considering hiring him.

Additional alleged facts pertinent to the motion will be discussed in the analysis below.

**COURT'S DISCUSSION**

A.     Standard of Review

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"     Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.   In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd.  v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

B.     Analysis

1.     Plaintiff Weaver's Title VII and ADA Claims

Defendant argues that plaintiff Weaver's Title VII and ADA claims must be dismissed as time barred.

"An individual alleging discrimination in violation of Title VII must first file an administrative charge with the EEOC." Chacko v. Patuxent Inst., 429 F.3d 505, 508 (4th Cir. 2005) (citing 42 U.S.C § 2000e-5(e)).   The same is true under the ADA provisions regarding employment discrimination.  Sydnor v. Fairfax County, 681 F.3d 591, 593 (4th Cir. 2012) ("[T]he ADA incorporates [Title VII's] enforcement procedures, including the requirement that a plaintiff must exhaust his administrative remedies by filing a charge with the EEOC before pursuing a suit

9

in federal court." (citations omitted)).  This charge must "be filed within [180] days after the alleged unlawful employment practice."  42 U.S.C. § 2000e-5(e)(1); see id. § 12117(a) (incorporating by reference for claims of ADA violations "the procedures set forth in section[] . . . 2000e-5").  "[T]he filing period runs from the time at which the employee is informed of the allegedly discriminatory employment decision, regardless of when the effects of that decision come to fruition." Price v. Litton Bus. Sys., Inc., 694 F.2d 963, 965 (4th Cir. 1982).  The temporal focus is "either the time of discharge or the moment the employee received advance notice of the pending discharge." Hamilton v. 1st Source Bank, 928 F.2d 86, 89 (4th Cir. 1990) (en banc); cf. Olson v. Mobil Oil Corp., 904 F.2d 198, 200 (4th Cir. 1990) ("The 180-day limitations period for an ADEA action arising out of a job termination commences when the employee is informed of his termination.").  "When the plaintiff fails to file such a complaint in a timely fashion with the EEOC, the claim is time-barred in federal court." McCullough v. Branch Banking & Tr. Co., 35 F.3d 127, 131 (4th Cir. 1994).

Here, plaintiff Weaver alleges that on May 10, 2019, during the meeting with Ehrhardt, he was told that defendant had "made a decision to 'end [his] relationship with Cary Academy,'" which Erhardt described as terminating plaintiff Weaver.  (Compl. ¶ 116; see also id. ¶ 117 ("[Plaintiff] Weaver stated that he did not understand why he was being terminated.")).  Ehrhardt further informed him that "a termination letter" had been prepared, and plaintiff was also offered a severance agreement that day.  (See id. ¶ 123).  The termination letter, dated May 10, 2019, purported to rescind defendant's previous offer of employment to plaintiff Weaver and stated that plaintiff Weaver's termination would be effective June 30, 2019.  (See id. ¶ 125; Termination Letter (DE 20-2) at 2).  Plaintiff Weaver filed an EEOC charge on November 15, 2019.  (See EEOC Charge (DE 19-1) at 2; see also Compl. ¶ 13 ("[Plaintiff] Weaver filed a Charge with the

Equal Opportunity Commission alleging violations of Title VII and Title I of the ADA by defendant.")).[2]

Accordingly, plaintiff Weaver filed his complaint with the EEOC 189 days after he "received advance notice of the pending discharge." Hamilton, 928 F.2d at 89. Therefore, his Title VII and ADA claims, (Compl. ¶¶ 136-141, 148-159), are untimely and, accordingly, "time-barred in federal court." McCullough, 35 F.3d at 131.

Plaintiff Weaver argues that his "180 days ran from the 'discrete act' of termination which occurred on June 30, 2019" and that the court should reject "the proposition that the 180 days for Plaintiff to file his EEOC [charge] began when he was informed on May 10, 2019, that his contract was being terminated for the 2019-2020 year." (Pls.' Resp. (DE 27) at 3-4). However, the court cannot ignore Hamilton's unambiguous direction that "this circuit . . . count[s] the 180 days from either the time of discharge or from the moment the employee received advance notice of the pending discharge." 928 F.2d at 89 (emphasis added); Felty v. Graves-Humphreys Co., 785 F.2d 516, 519 (4th Cir. 1986) (finding that limitations period began to run upon receipt of separation agreement containing the clear position that, as of that date, notice was being given that plaintiff's last day of work was 4 months later).

Further, plaintiffs' own complaint describes "his termination" as being "on May 10, 2019," (Compl. ¶ 127), and plaintiff Weaver argues he knew on May 10, 2019, "that is contract to begin July 1, 2019, was terminated . . . only because of his opposition to the discriminatory treatment of him and his son," (Pls.' Resp. (DE 27) at 8). Such awareness of the alleged discriminatory nature of the conduct is not even required to start the 180-day limitations period, Olson, 904 F.2d at 201,

---

[2]     Where referenced in the complaint, and integral to the complaint, the court considers both the May 10, 2019, termination letter and plaintiff Weaver's EEOC charge in resolving the instant motion. Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016).

but is a further basis, in this instance, for the initiation of the 180-day deadline. Plaintiffs fail to allege sufficient reason why the 180-day limitations period did not begin to run on May 10, 2019, when plaintiff was told he was being terminated as memorialized in a termination letter, informing him of date certain for that termination.

In sum, plaintiff Weaver's Title VII and ADA claims are dismissed without prejudice as time barred.

2.      Section 1981 Claims

Section 1981 provides in relevant part that "all persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981.

a.      Plaintiff Weaver's Claim

Federal courts have interpreted § 1981 to prohibit discrimination on the basis of race in the realm of employment. See Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 609 (1987) ("[T]he Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts."); Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 551-52 (4th Cir. 2006) ("[Section] 1981 . . . prohibits discrimination in employment on the basis of race").

While plaintiff Weaver's Title VII claims are dismissed for the reasons above, the court turns to Title VII jurisprudence to assist in analyzing whether he has stated a claim for employment discrimination under § 1981. See, e.g., Gairola v. Com. of Va. Dep't of Gen. Servs., 753 F.2d 1281, 1285 (4th Cir. 1985) ("Under Title VII and either § 1981 or § 1983, the elements of the required prima facie case [of employment discrimination] are the same."); McCray v. Pee Dee Reg'l Transp. Auth., 263 F. App'x 301, 305 (4th Cir. 2008) ("The elements of a claim under § 1981 or § 1983 mirror those of Title VII."). At its core, a Title VII claim must be supported by allegations of facts sufficient "to satisfy the elements of a cause of action created by that statute,"

12

meaning an adverse employment action <u>because of</u> plaintiff's protected characteristic. <u>See</u> <u>McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.</u>, 780 F.3d 582, 585 (4th Cir. 2015). Factual allegations that are merely consistent with discriminatory intent by decisionmakers, on their own, are not enough. <u>Bing v. Brivo Sys., LLC</u>, 959 F.3d 605, 618 (4th Cir. 2020); <u>McCleary-Evans</u>, 780 F.3d at 586 (describing "the allegation that non-Black decisionmakers hired non-Black applicants instead of the plaintiff [as] consistent with discrimination" but "not alone support[ing] a reasonable inference that the decisionmakers were motivated by bias"). The complaint must do more than leave the court "to speculate to fill in the gaps as to [defendant's] motivation for the" allegedly discriminatory conduct. <u>Bing</u>, 959 F.3d at 618 (quotation omitted).

Plaintiff Weaver fails to allege facts sufficient to claim that the reason defendant terminated him was because of his race. For example, the complaint purports to "repeatedly allege" that defendant acted because of plaintiff Weaver's race and that it fostered a racially discriminatory atmosphere that impacted him and others. <u>See</u> <u>McCleary Evans</u>, 780 F.3d at 585-86. These allegations, however, are naked assertions amounting to "no more than conclusions." <u>See</u> <u>id.</u> Further factual enhancement is needed to support such claims.

In this case, there is not further factual enhancement in the complaint sufficient to support a reasonable inference that Ehrhardt or other relevant decisionmakers were motivated by racial bias or acted because of plaintiff Weaver's race. In particular, three events upon which plaintiffs rely in the complaint fail to support a reasonable inference of racially discriminatory motivation on the part of defendant's decisionmakers.

First, the complaint's allegations regarding the February 15, 2016, incident at the pick-up line in which a parent was disrespectful to plaintiff Weaver do not make it plausible that any later, or even concurrent, acts on the part of defendant, through its agents, were on the basis of racial

13

bias. In fact, the complaint alleges that when plaintiff Weaver informed the upper school head, she talked to the parent, explaining that the parent's comment was dismissive and requesting an apology, which the parent refused to do. (See Compl. ¶¶ 30-32). Although Ehrhardt is alleged to have not provided the support plaintiff hoped for and to have failed to follow-up with plaintiff Weaver, there is no adjoining factual allegation that makes plaintiffs' allegation of racial bias as the motivation for this action plausible. Such conduct, even if it could be said to be consistent with racial bias, does not raise the reasonable inference of that bias standing alone. Plaintiff has not alleged facts raising the reasonable inference that similar complaints by non-black teachers were handled by Ehrhardt in a more direct or effective manner. Cf. Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 191 (4th Cir. 2010) ("The complaint does not even allege that [comparator's] 'outside business involvements' were improper, let alone that any impropriety was comparable to the acts [plaintiff] was alleged to have committed."), aff'd, 566 U.S. 30 (2012). Given that the complaint does not support a reasonable inference that this incident was racially motivated, it also fails to support an inference that the later termination was racially charged.

Second, the related incident at the "Voices of a Minority" workshop in November 2017 also fails to raise a reasonable inference that any later conduct was racially motivated. Ehrhardt's alleged stoicism in the face of plaintiff Weaver's retelling of the pick-up line incident and how it made him feel, along with Ehrhardt's failure to follow-up about the incident with plaintiff Weaver, is insufficient to raise a reasonable inference of racial bias. Any inference arising from this incident that plaintiff Weaver's later firing by Ehrhardt was on the basis of race would be "unwarranted" and instead based on "pure speculation." See Nemet, 591 F.3d at 253, 259. Instead, the facts alleged support a reasonable inference of, at most, a "strained relationship" but not one which was strained "based upon . . . race." Irani v. Palmetto Health, 767 F. App'x 399, 417 (4th Cir. 2019)

(explaining that to present an actionable hostile work environment claim, the work environment must be <u>racially</u> hostile).

Third, the failure of the "administration at Cary Academy" to "inform [plaintiff] Weaver of the time change for the ceremony" for "'Teacher of the Year' at a Wake County Educators session" also is insufficient to make plaintiffs' claim that plaintiff Weaver's later termination was racially discriminatory plausible. (Compl. ¶ 38; <u>see also</u> <u>id.</u> ¶ 39 (describing this as the result of "a miscommunication")). Plaintiffs rely on allegations that other previous winners of the award were treated differently, with those teachers being "lauded at faculty meetings and on the school website." (<u>Id.</u> ¶ 40). However, the complaint does not allege that these other teachers were, for example, all white or other similar facts that would even begin to support a reasonable inference that the distinction made between plaintiff Weaver's achievement and those of his predecessors was a racial one. <u>See generally</u> <u>Harman v. Unisys Corp.</u>, 356 F. App'x 638, 640-41 (4th Cir. 2009) (explaining that plaintiff's allegation that he believed that other workers of a different race would not have been treated similarly was a "conclusory allegation" and therefore "insufficient to defeat a motion to dismiss"); <u>16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.</u>, 727 F.3d 502, 506 (6th Cir. 2013) ("[T]he plaintiffs have not identified any similarly situated individuals whom [defendant] treated better. They have merely alleged their 'belief' that such people exist.").

None of these alleged events, on their own or together, permit a reasonable inference of "a general pattern of racial discrimination in the practices of a defendant" such as would allow the court to "infer discriminatory intent." <u>Woods v. City of Greensboro</u>, 855 F.3d 639, 649 (4th Cir. 2017). Instead, "[t]he complaint allege[s] no facts to support the claim that anyone at the [Cary Academy] in fact held the hypothesized bias or said anything that indicated such a bias." <u>See</u> <u>Hegab v. Long</u>, 716 F.3d 790, 796 (4th Cir. 2013); <u>see also</u> <u>Iqbal</u>, 556 U.S. at 683 ([Plaintiff's]

15

complaint does not contain any factual allegation sufficient to plausibly suggest [defendant's] discriminatory state of mind.").

As an additional basis for asserting discriminatory intent, the complaint contends that the reasons for plaintiff Weaver's firing were pretextual. (See, e.g., Compl. ¶ 138). Plaintiffs assert that at the time of plaintiff K.W.'s tryout, the ostensible primary cause of plaintiff Weaver's firing, no one from the school's administration reached out to either plaintiff to inquire about the situation or to otherwise reprimand plaintiffs regarding the purported impropriety of their conduct. (See Compl. ¶¶ 65-68). Plaintiffs also allege that, within months following the incident, defendant offered plaintiff Weaver a contract for the following academic year. (Id. ¶ 69). According to the complaint, it was only when issues arose about plaintiff K.W. attending the trip to Argentina, approximately six months after the tryout, that the possibility of plaintiff Weaver's termination was discussed. (See id. ¶¶ 110, 126-27).[3] The complaint also describes several interim instances where "[p]laintiff Weaver was given multiple responsibilities which involved his being entrusted with the safety of Cary Academy students." (See id. ¶¶ 127-29).

While these allegations may permit an inference that the reasons given for the firing were pretextual, they do not tend to show that the actual reason for the termination was racial discrimination. See Hegab, 716 F.3d at 796 (describing plaintiff's assertion "that the agency did not make its decision for the reasons that it gave and therefore must have acted from an unconstitutional bias" as a "speculative" rather than "colorable" claim); Lightner v. City of

---

[3] Defendant asserts that this delay is attributable to the fact that "Cary Academy was not aware until April 2019 that [plaintiff] Weaver had knowingly allowed his son to participate in the tryouts," a fact that it alleges is "made plain in his termination letter." (Def.'s Reply (DE 28) at 2). The termination letter also notes as pertinent to the firing decision another situation where plaintiff Weaver is alleged to have transported students off-campus without informing the administration and a single instance of plaintiff Weaver arriving to work late. (Termination Letter (DE 20-2) at 3). For purposes of the instant analysis, however, the court does not rely upon defendant's asserted reasons for the timing of plaintiff's firing.

Wilmington, 545 F.3d 260, 264 (4th Cir. 2008) ("Consequently, [plaintiff's] suspension, however wrongful, is not actionable under Title VII."); Carpenter v. Fed. Nat. Mortg. Ass'n, 165 F.3d 69, 72 (D.C. Cir. 1999) ("Sometimes an employer may offer a meritocratic or otherwise high-sounding explanation for a decision intending to cover up an unsavory reason—but one that is not illegal under the antidiscrimination laws."); see also Hazen Paper Co. v. Biggins, 507 U.S. 604, 613 (1993) ("[I]nferring age-motivation from the implausibility of the employer's explanation may be problematic in cases where other unsavory motives, such as pension interference, were present."). Even where the complaint plausibly alleges the reason an employer gave for the termination of employment was false, it still must "establish a plausible basis for believing . . . that race was the true basis for [plaintiff's] termination." See Coleman, 626 F.3d at 190-91. See generally Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 140 S. Ct. 1009, 1014-17 (2020) (explaining that § 1981 requires that race was a but-for cause of plaintiff's injury).

Here, even accepting that "the operative complaint contains allegations of fact which undermine [defendant's] explanation for its conduct," it does not contain sufficient factual matter to give rise to a reasonable inference that the proffered reasons were mere "pretext for unlawful discrimination in violation of § 1981." See Woods, 855 F.3d at 649, 651. The other factual allegations do not give rise to a reasonable inference of racial discrimination and, therefore, even when combined with plaintiffs' claim of pretext, they cannot import a plausible basis for believing that race was the true reason for plaintiff Weaver's termination.

Plaintiffs nonetheless argue that this case in analogous to Woods v. City of Greensboro, 855 F.3d 639 (4th Cir. 2017). In that case, the United States Court of Appeals for the Fourth Circuit concluded that "allegations includ[ing] (1) the results of a disparity study demonstrating a pattern of the City almost exclusively lending to nonminority-owned businesses; (2) facts which

17

suggest that the Woods' residence had sufficient equity to fully secure a third-position lien; and (3) examples of how the City has treated nonminority businesses differently, including taking a third-position lien in approving a loan to a nonminority corporation" were sufficient to plausibly state a claim of § 1981 racial discrimination. Id. at 648 (emphasis omitted). Plaintiffs have not alleged analogous facts such as facts demonstrating a pattern by defendant in almost exclusively firing black teachers and other analogously discrete examples of how defendant has treated, for example, white teachers differently than plaintiff Weaver. Unlike the Woods plaintiffs, plaintiffs have not joined their claim of pretext with factual allegations sufficient to "nudge" their claim of invidious racial discrimination "across the line from conceivable to plausible." See 855 F.3d at 648 (quoting Twombly, 550 U.S. at 570).

Plaintiffs also argue that "[e]ither [p]laintiffs will be able to adduce sufficient evidence during discovery to prove that [d]efendant[] ha[s] treated non-White [sic] teachers and students differently from teachers and students of color or not." (Pl.'s Resp. (DE 27) at 3). However, the Supreme Court has already "reject[ed] a standard that would allow a complaint to 'survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some set of [undisclosed] facts to support recovery.'" McCleary-Evans, 780 F.3d at 587 (second alteration in original) (quoting Twombly, 550 U.S. at 561).

Finally, plaintiffs argue that they have alleged a plausible claim of retaliation under § 1981. Their complaint, however, asserts only Title VII and the ADA as bases for retaliation causes of action. (Compare Compl. ¶¶ 142-47 (plaintiffs' § 1981 claim), with id. ¶¶ 148-59 (plaintiffs' separately denoted ADA and Title VII retaliation claims)). Moreover, the complaint does not support a reasonable inference that any activity protected by § 1981 and engaged in by plaintiff Weaver was causally connected to his firing. See generally Ali v. BC Architects Engineers, PLC,

832 F. App'x 167, 172-73 (4th Cir. 2020) ("[T]o state a § 1981 retaliation claim, a plaintiff must allege facts rendering it plausible that, but for her participation in protected activity, she would not have suffered a materially adverse action.").

In sum, "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct" in plaintiff Weaver's termination. Iqbal, 556 U.S. at 679. Therefore, plaintiff Weaver's § 1981 claim based upon his termination must be dismissed without prejudice.[4]

    b.    Plaintiff K.W.

"A § 1981 action . . . must be founded on purposeful, racially discriminatory actions that affect at least one of the contractual aspects listed in § 1981(b)." Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1018 (4th Cir. 1999). Section 1981(b) states that "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Parents of a student may have a § 1981-cognizable contractual relationship with a school. See, e.g., Runyon v. McCrary, 427 U.S. 160, 172 (1976) ("The parents . . . sought to enter into contractual relationships with [defendant school] for educational services. . . . Under those contractual relationships, the schools would have received payments for services rendered, and the prospective students would have received instruction in return for those payments."); Fiedler v. Marumsco Christian Sch., 631 F.2d 1144, 1150 (4th Cir. 1980) (explaining that § 1981 is "applicable to contracts for educational services"). See generally Brenner v. Little Red Sch. House, Ltd., 302 N.C. 207, 212 (1981).

---

[4]    To the extent plaintiff's complaint asserts a claim based upon the allegedly negative reference provided by Ehrhardt to plaintiff Weaver's new potential employer, the complaint fails to allege facts permitting an inference that this action was racially motivated. Further, plaintiffs' complaint negates the requisite but-for causation for such a § 1981 claim, see Comcast Corp., 140 S. Ct. at 1014-17, by alleging that "Ehrhardt had given [plaintiff Weaver] a negative reference in order to prevent [plaintiff] Weaver from getting a job at Ravenscroft . . . where parents whose children were enrolled at Cary Academy might be tempted to switch . . . due to [plaintiff Weaver's] teaching there." (Compl. ¶ 135).

Here, plaintiffs allege, in reference to plaintiff K.W.'s § 1981 claim, that "Plaintiff K.W. . . . was denied participation in the foreign exchange trip because he is Black." (Compl. ¶ 168). In their response to the instant motion, plaintiffs also assert that plaintiff's K.W.'s receipt of "a failing grade without the matter being discussed with his father and without any formal school intervention to avoid a failing grade" "state[s] a prima facie case for discrimination (and retaliation) in violation of section 1981." (Pls.' Resp. (DE 27) at 16). Finally, plaintiffs describe plaintiff K.W.'s being "publicly accused of having received help to produce work he had submitted as his own" as an "incident of discrimination" relevant to his § 1981 claim. (Id.)

However, the complaint does not allege sufficient factual matter to permit an inference of a contractual relationship between plaintiff K.W. and defendant, specifically, as it relates to the foreign exchange trip or the policy regarding failing grades. Because these are alleged to be in the form of goals and policies of the school, without more, they are not contractual. (See, e.g., Compl. ¶¶ 56 ("[I]t was school policy that a student may NOT receive an 'F' on his/her report card unless there had been communication with the parents and formal teacher intervention to provide student support."), 71 ("The[] [foreign exchange program] materials . . . state that '[i]t is the goal of the School that every student participate in the program.'" (emphasis added)). See Sheppard v. Visitors of Va. State Univ., 993 F.3d 230, 239 (4th Cir. 2021) ("[Plaintiff] advances that under Virginia law he had an implied contract with [defendant] under its Student Code of Conduct . . . . [The court's] review . . . suggests state law does not support [plaintiff's] view."); Tibbetts v. Yale Corp., 47 F. App'x 648, 656 (4th Cir. 2002) ("Chapter 11 of the Student Handbook is not a contract, but merely a university policy."). The complaint does not contain any meaningful factual allegations regarding a contractual relationship between plaintiff K.W. and defendant or allegations such that the court could reasonably infer that the provision of the foreign exchange

trip and support or notice regarding failing grades was a part of the "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of [a] contractual relationship" between plaintiff K.W. and defendant. 42 U.S.C. § 1981(b). Plaintiff K.W.'s § 1981 claim fails on the basis that the complaint does not make plausible that any conduct by defendant "affect[ed] at least one of the contractual aspects listed in § 1981(b)" in relation to plaintiff K.W. See Spriggs, 165 F.3d at 1018.

In addition to the lack of contractual nexus, the complaint fails to plead sufficient facts to support a reasonable inference that defendant's conduct towards plaintiff K.W. was because of his race. As to the primarily cited instance of alleged racially motivated discrimination in contracting (plaintiff K.W.'s exclusion from the foreign exchange trip), plaintiffs fail to plead, beyond bare assertions, any facts making such motivation plausible. While plaintiffs now assert that "other White students with medical reasons had been permitted to participate in exchange trips," (see Pls.' Resp. (DE 27) at 17), the complaint merely alleges that "[p]laintiff K.W. Weaver was not allowed to participate in the exchange trip for reasons that no other White students would have been prevented from participating," (Compl. ¶ 167), which is a bare assertion devoid of further factual enhancement and based on plaintiffs' speculation. See, e.g., Harman, 356 F. App'x at 640-41. While the complaint alleges that plaintiffs received conflicting information and rationales for the decision to exclude plaintiff K.W., (see, e.g., Compl. ¶¶ 74, 82, 91), it, like the complaint in Bing, "fail[s] to plead sufficient facts to plausibly claim" plaintiff K.W.'s exclusion "was racially motivated." 959 F.3d at 618. On the complaint, the court is left to "'speculate' . . . as to [defendant's] motivation." Id.

Similarly, the allegations regarding plaintiff K.W.'s receipt of a failing grade and being questioned whether he had actually written the work he submitted do not give rise to a reasonable

inference of racial bias. Despite plaintiffs' assertion in their briefing that "[o]ther students who were not Black and who were in danger of failing did in fact receive[] parental notification and school support," (Pls.' Resp. (DE 27) at 16), such a factual assertion is absent from the actual complaint. So too is plaintiffs' assertion that plaintiff K.W. "was publicly accused of having received help to produce work he had submitted as his own, unlike other Cary Academy students." (Id.) (emphasis added). These "statements . . . rais[ing] new facts constitute matters beyond the pleadings and cannot be considered on a Rule 12(b)(6) motion." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 449 (4th Cir. 2011). In short, as with their allegations regarding the foreign exchange trip, plaintiffs' allegations regarding plaintiff K.W.'s failing grade and public questioning fail to contain sufficient factual matter to state claims of racial discrimination that are plausible on their faces.

Plaintiff K.W.'s § 1981 claim does not survive defendant's Rule 12(b)(6) motion due to lack of sufficient factual matter and must, therefore, be dismissed without prejudice.

3.    Plaintiff K.W.'s ADA Claim

Title III of the ADA states that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182; see also id. § 12181(7)(J) (explaining that "a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education" is "considered [a] public accommodation[] . . . if the operations of such entit[y] affect[s] commerce"). Under this section, "'discrimination' . . . includ[es] 'a failure to make reasonable modifications' that are 'necessary' to provide a disabled individual with such full and equal enjoyment, 'unless the entity can

22

demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.'" Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 461 (4th Cir. 2012) (quoting 42 U.S.C. § 12182(b)(2)(A)(ii)).

However, 42 U.S.C. § 12188(a)(1)'s allowance of a private cause of action for violations of Title III only allows for injunctive relief. Thomas v. The Salvation Army S. Territory, 841 F.3d 632, 638 (4th Cir. 2016) ("Title III of the ADA . . . provides a private right of action for injunctive relief but no right of action for monetary relief."); see 42 U.S.C. § 12188(a)(1) (incorporating 42 U.S.C. § 2000a-3(a)); see also id. § 2000a-3(a) ("[A] civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved."). Therefore, the only relief plaintiff K.W. could be afforded under Title III of the ADA would not reach his alleged "damages [suffered] as a result of [d]efendant's violations of the ADA." (Compl. ¶ 179; see also id. at 35-36 (seeking award to plaintiff K.W. of "the cost of the illegally denied opportunity to participate in the foreign exchange trip and other damages resulting from the [d]efendant's denial of the opportunity to participate in the foreign exchange trip" and "compensation" for plaintiff K.W. "for nonpecuniary losses . . . in amounts to be proven at trial"). In this part, plaintiff K.W.'s Title III ADA claim for damages must be dismissed with prejudice.

Plaintiff K.W. requests that the court "enjoin [d]efendant . . . from discriminating on the basis of disability in providing foreign exchange opportunities to its students" and that the court "order [d]efendant Cary Academy to institute and carry out policies, practices, and programs which provide equal opportunities to qualified individuals with disabilities." (Id. at 35-36). Yet, § 12188(a)(1), by its own text, allows for injunctive relief for a person "who is being subjected to discrimination on the basis of disability" or "who has reasonable grounds for believing that such

person <u>is about to be subjected to discrimination</u> in violation of section 12183," which specifically concerns "new construction and alterations in public accommodations and commercial facilities," 42 U.S.C. § 12183 (emphasis added).

Based on the allegations in the complaint, it is unclear that plaintiff K.W. even still attends defendant's school or that defendant has continued the allegedly illegal conduct or would act illegally again in the future. Cf. <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 111 (1983) ("[An] equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again."). Plaintiffs have not pleaded facts sufficient to show cognizable and remediable harm under Title III of the ADA. See <u>Nanni v. Aberdeen Marketplace</u>, Inc., 878 F.3d 447, 455 (4th Cir. 2017) ("[W]hen [a] [Title III] ADA plaintiff has alleged a past injury at a particular location, his plausible intentions to thereafter return to that location are sufficient to demonstrate the likelihood of future injury."); <u>see, e.g.</u>, <u>Thomas</u>, 841 F.3d at 638 ("[Plaintiff] fails to show any real or immediate threat that she will be harmed again" because the previous denial of access to public accommodations "occurred almost two years before" and there are no allegations that "defendants would still deny her access to" the public accommodation "because of her disability"); <u>see also</u> <u>Kennedy v. Floridian Hotel, Inc.</u>, 998 F.3d 1221, 1230 (11th Cir. 2021) ("[A] plaintiff can prevail in a[] [Title III] ADA case unless they prove a real and immediate threat of future injury.").

In sum, plaintiff K.W.'s Title III ADA claim for damages must be dismissed with prejudice, and the same claim for injunctive relief must be dismissed without prejudice.

4.      Breach of Contract Claim

"The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of the contract." <u>Wells Fargo Ins. Servs. USA, Inc. v. Link</u>, 372 N.C. 260, 276

24

(2019) (quotation omitted); accord Edwards v. Genex Coop., Inc., 777 F. App'x 613, 624 (4th Cir. 2019) ("Under North Carolina law, '[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract.'" (quoting Poor v. Hill, 138 N.C. App. 19, 25 (2000))).   "[A]n employee without a definite term of employment is an employee at will and may be discharged without reason." Coman v. Thomas Mfg. Co., 325 N.C. 172, 175 (1989); see also Jackson v. Long, 102 F.3d 722, 728 (4th Cir. 1996) ("Under North Carolina law, employment is generally presumed to be 'at-will' in the absence of a contract establishing a definite employment duration or a statute or ordinance restricting an employee's discharge.").

However, "[w]here . . . other circumstance[s] . . . show[] that, at the time the parties contracted, they intended the employment to continue through a fixed term, the contract cannot be terminated at an earlier period except for cause or by mutual consent." Still v. Lance, 279 N.C. 254, 259 (1971).  "Under the employment at will doctrine, the burden of showing that a contract of employment exists and is sufficiently specific in its terms to rebut the presumption of employment at will rests with the employee." Jenkins v. AKZO Noble Coatings, Inc., 35 F. App'x 79, 83 (4th Cir. 2002).

Here, the offer letter, which plaintiff Weaver alleges he accepted by return, states that "[t]he term of [plaintiff Weaver's] employment will begin on July 1, 2019, and will end on June 30, 2020 (the 'Term')." (Offer Letter (DE 20-1) at 2).[5]  However, the offer letter caveats this "term of employment" by stating it is "subject to the Termination section below." (Id.).  In that section, the offer letter explains that plaintiff Weaver's "employment with the Schools is on an 'at will' basis, meaning that either [he] or the School may terminate [his] employment at any time, with or without

---

[5]       Like plaintiff Weaver's termination letter, the offer letter is integral to the complaint, (see, e.g., Compl. ¶ 69), and its authenticity has not been challenged.  See generally Goines, 822 F.3d at 165.

notice, for any reason or for no reason." (Id.). Further, above the line for plaintiff Weaver to sign to "accept[] . . . the terms contained and referenced in th[e] letter," it states that the signee "understand[s] that employment at Cary Academy is at the will and discretion of the Head of School." (Id. at 3).

Accordingly, any "term" described by the letter is not a "definite" one as that term is used by North Carolina courts, see, e.g., Kurtzman v. Applied Analytical Indus., Inc., 347 N.C. 329, 331 (1997), because the parties cannot be said to have "intended the employment to continue through a fixed term," Still, 279 N.C. at 259, where either party could end the employment relationship at any time and both understood that ability controlled the offer letter's description of a term. In light of the offer letter's specific allowance of the end of the term of employment at-will, the contracting parties have not "remove[d] the at-will presumption by specifying a definite period of employment contractually." See Kurtzman, 347 N.C. at 331. Instead, plaintiff Weaver has "failed to allege that he was promised that his employment would continue through a fixed term." Jenkins v. Town of Bryson City, No. 91-1054, 1991 WL 204912, at *2 (4th Cir. Oct. 11, 1991) (emphasis added); see Bishop v. Wood, 426 U.S. 341, 345 (1976) ("[A]n enforceable expectation of continued public employment . . . can exist only if the employer, by statute or contract, has actually granted some form of guarantee." (emphasis added) (citing Still v. Lance, 279 N.C. 254 (1971))).

Plaintiff argues nonetheless that the following statement by the Supreme Court of North Carolina in Still controls:

> The nature of school operations is such that, in the absence of evidence of a contrary intent, a contract for the employment of a school teacher is presumed to be intended by the parties to continue to the end of the school year and not to be terminable by either party prior to that time without cause and without the consent of the other party.

(Pls.' Resp. (DE 27) at 12 (quoting <u>Still</u>, 279 N.C. at 259)). However, the court is presented here with "evidence of a contrary intent," namely, a contract that specifically states that the term of employment described within is subject to termination at-will by either party. <u>Still</u>, 279 N.C. at 259.

Plaintiffs further argue that the offer letter incorporates the school's employee handbook and that "[w]ithout discovery, [p]laintiff Weaver is unable to say whether there is more evidence in the Employee Handbook which would undermine the school's claim that Weaver's employment was strictly at will." (Pls.' Resp. (DE 27) at 13). This constitutes speculation as to possible evidence and is not sufficient to defeat a motion to dismiss. <u>See</u> <u>McCleary-Evans</u>, 780 F.3d at 587.

The offer letter itself states that "[t]ermination of [plaintiff Weaver's] employment <u>should</u> be conducted in accordance with the notice provisions contained in the School's Employee Handbook." (Offer Letter (DE 20-1) at 2-3 (emphasis added)). Even assuming that this statement constitutes the required "express inclu[sion]" of "an employer's personnel manual" into an "employee's contract of employment," <u>Soles v. City of Raleigh Civ. Serv. Comm'n</u>, 345 N.C. 443, 446-47 (1997), it must be understood in light of the immediately preceding sentence that unequivocally states that either party may terminate employment "with or without notice," elucidating the following sentence's use of "should" as aspirational. Regardless, the employee handbook is not before the court, and plaintiffs' pleadings contain no allegations regarding its protections as to plaintiff Weaver's employment.

Therefore, plaintiff Weaver's breach-of-contract claim fails and must be dismissed without prejudice.

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss (DE 18) is GRANTED. Plaintiff K.W.'s Title III ADA claim for damages is DISMISSED WITH PREJUDICE. Plaintiffs' remaining claims are DISMISSED WITHOUT PREJUDICE. Plaintiffs are allowed a 21-day period of time, from the date of this order, to seek leave to file a second amended complaint. In the event plaintiffs fail to move for leave to amend complaint within 21 days of the date of this order, the clerk is DIRECTED to close this case without further order of this court.

Pursuant to Rule 5.2(a), the clerk is DIRECTED to retain plaintiffs' amended complaint (DE 7) under seal due to the document's inclusion of the name of an individual known to be a minor in certain headings of the complaint.

SO ORDERED, this the 27th day of September, 2021.


_____
LOUISE W. FLANAGAN
United States District Judge