IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CV-593-FL

| | | |
|---|---|---|
| TROY K. WEAVER, and K.W., a minor, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| CARY ACADEMY, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (DE 44). The issues raised are ripe for ruling. For the following reasons, the motion is granted in part and denied in part.

## STATEMENT OF THE CASE

Plaintiffs commenced this action on November 9, 2020, alleging discriminatory conduct by defendant, the former employer of plaintiff Troy K. Weaver ("Weaver") and school attended by plaintiff K.W. On defendant's motion, the court previously dismissed plaintiffs' complaint for failure to state a claim, allowing plaintiffs a 21-day period to seek leave to file an amended complaint. (Sept. 27, 2021, Order (DE 29) at 28).

Thereafter, with leave of court, plaintiffs filed the operative second amended complaint (the "complaint"),[1] again alleging discriminatory conduct by defendant, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S. § 2000e et seq., ("Title VII"), 42 U.S.C. § 1981, the

---

[1]     Hereinafter, all references to the complaint or "Compl." in citations are to the operative second amended complaint filed November 29, 2021 (DE 36).

Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"), and North Carolina common law. Specifically, plaintiffs allege that plaintiff Weaver's termination was impermissibly motivated by his race, retaliatory intent, and his association with his disabled son, and that defendant breached an implied contract with plaintiff Weaver. In respect to plaintiff K.W., plaintiffs allege that defendant breached an implied contract with plaintiff K.W. and did so for racially discriminatory reasons.

## STATEMENT OF FACTS

The facts alleged in the complaint may be summarized as follows.[2] Plaintiff Weaver, "who is Black," was an "Upper School science teacher" at defendant's school during the relevant time period. (Compl. ¶ 14). His minor son, plaintiff K.W., attended defendant's school as a student during this time.

Plaintiffs allege that since the beginning of Michael Ehrhardt's ("Ehrhardt") tenure as head of school in July 2012, "the culture of the school began to change," such that "[d]iversity and inclusion were no longer a prominently articulated goal" and "Black staff, students, and families began to feel marginalized." (See id. ¶¶ 14-16, 18). They describe defendant's practice of "listen[ing] to . . . parents and children describe . . . incidents that caused them to feel that they were being subjected to race discrimination," but subsequent "refus[al] to discipline the students engaging in the behavior." (Id. ¶ 21). Similarly, offending teachers were allegedly "simply sen[t] to 'diversity training' as the only effort to address . . . concerns." (Id.). Accordingly, plaintiffs and "other black students and teachers . . . [did not] experience[] the inclusion advertised by [defendant]" as selling point of its educational environment. (Id. ¶¶ 19-20).

---

[2]     The court restates herein the statement of facts from the court's prior order, updated with changes included in the operative second amended complaint. (Sept. 27, 2021, Order (DE 29) at 2-8).

2

For example, on February 15, 2016, plaintiff Weaver was serving as the faculty member in charge of "3:15 dismissal and ensur[ing] safety for students with traffic flow and pick-up." (Id. ¶ 23). During that dismissal period, one car was obstructing the flow of traffic, which caused plaintiff Weaver to go over and speak to the driver. (Id. ¶ 24). The driver, a parent of a student, refused to make eye contact with plaintiff Weaver or move forward to assist traffic flow and informed plaintiff Weaver "that 'if [he] had a problem with it [he] could see . . . Ehrhardt.'" (Id. ¶¶ 25-26 (alterations in original)).

Because this incident "upset and disturbed plaintiff" Weaver due to "the lack of respect and courtesy shown him as a teacher at the school," plaintiff Weaver raised the incident with the head of the upper school, Heather Clarkson ("Clarkson"), who promised to talk to the parent-driver. (Id. ¶ 27). Clarkson "requested an apology from the parent, but the parent . . . refused to apologize for his interactions with [p]laintiff Weaver." (Id. ¶ 29). Plaintiff Weaver and Ehrhardt met to discuss the incident, but Ehrhardt was allegedly dismissive and unhelpful and failed to follow-up on the issue. (See id. ¶ 31).

In November 2017, at a "Voices of a Minority" session that was part of the school-staff's week of professional development, attended by Ehrhardt, plaintiff Weaver recounted his "experience involving the parent and the pick-up situation" as a "school situation in which [he] felt as though [his] voice [was] in the minority." (See id. ¶¶ 33-34). Plaintiffs allege that plaintiff Weaver hoped that recounting the situation would let Ehrhardt know that plaintiff "Weaver still felt upset and marginalized by the experience" and "would prompt further dialogue about the incident." (Id. ¶ 35). Ehrhardt allegedly "sat stoically as [plaintiff] Weaver recounted his experience," but "never approached [plaintiff] Weaver after . . . to discuss the experience or [plaintiff] Weaver's feelings of marginalization due to the incident." (Id.).

3

In another alleged incident, defendant's administration failed to inform plaintiff Weaver of a time change for a Wake County Educators session that included a ceremony awarding a "Leadership in Teaching Award," although they informed other, white teachers of that change. (Id. ¶ 37). This resulted in plaintiff Weaver missing the presentation of the award, which he had in fact won. Further, this achievement was not recognized or lauded by Clarkson or the administration, despite such treatment for previous, white winners.

Plaintiffs also describe the experience generally for black employees at defendant's school. On the complaint, five of the nine "black faculty or staff employees . . . resigned or were terminated between" 2018 and 2019. (Id. ¶ 43). Further, plaintiffs allege that "[b]lack faculty members were routinely rejected for leadership positions" and "committee memberships." (Id. ¶ 44). For example, in hiring for the position of head of the upper school, defendant selected the single white applicant, Clarkson, out of the four total applicants, which included plaintiff Weaver and two other black educators. Clarkson's predecessor in the position is alleged to have publicly berated a black employee and "to have made derogatory and biased comments about employees of color." (Id. ¶ 49). Other black employees allegedly reported similar feelings of ostracism and experiences of racial discrimination. (See id. ¶¶ 50-57).

Plaintiffs assert that current and former students' comments reflect that they endured similar racially discriminatory treatment. (Id. ¶ 58-59). Plaintiff K.W. alleges he was an exemplar of such, suffering feelings of marginalization, isolation, and a lack of respect. When plaintiff K.W. began attending defendant's school in sixth grade, he was "one of two Black males" in the grade. (Id. ¶ 61). In April 2016, plaintiff K.W.'s seventh-grade year, he "was diagnosed with a congenital heart condition called hypertrophic cardiomyopathy," which precluded his participation in competitive sports, due to his doctor's recommendation. (Id. ¶ 62). In spring of 2017, plaintiff

4

K.W. became "the only Black male in the 9th grade class" when his classmate and best-friend left for another school and defendant did not admit any other black male students into plaintiff K.W.'s class. (Id. ¶ 64). This caused plaintiff Weaver concern, so he scheduled a meeting with Ehrhardt, but Ehrhardt allegedly was uninterested and unconcerned. Plaintiff K.W. struggled academically, emotionally, and socially during that year.

These struggles were shared with certain members of defendant's administration, including the upper school counselor, but she did not follow-up with plaintiff K.W. Plaintiff Weaver then met with all of his son's teachers to ask for their assistance in enabling plaintiff Weaver to provide parental support, specifically, including that plaintiff Weaver be informed of any assignments plaintiff K.W. failed to turn in. Plaintiff K.W. was assigned a "[l]earning specialist," Laura Werner ("Werner"), to assist with his academic struggles. (Id. ¶ 69). However, Werner verbally questioned plaintiff K.W. in front of others whether "he had really written [an English assignment] himself," which is alleged not to have happened with white students. (Id. ¶ 70). Plaintiff Weaver met with the upper school head to express his disappointment over this incident, and Werner apologized to plaintiff K.W.

Around this time, plaintiff K.W. received a failing grade in Spanish. Plaintiff Weaver had personal knowledge of the school's policy that a student could not "receive an 'F' on his/her report card unless there ha[s] been communication with the parents and formal teacher intervention to provide student support," which had not happened in plaintiffs' case. (Id. ¶¶ 73-75). Further, plaintiff Weaver asserts that, in his experience as a faculty member, white students had the benefit of follow-up from defendant's administration in the wake of a failing grade. (Id. ¶ 74). Members of defendant's administration promised to look into the situation but failed to follow-up with plaintiff Weaver.

Another instance of defendant's alleged discrimination finds its roots in the school's men's basketball team tryouts held in fall of 2018. Plaintiff K.W. attended the second day of tryouts and falsely informed an assistant coach that he had received the requisite medical clearance to play, but plaintiff Weaver was actually still in discussion with his son's doctor about the possibility of plaintiff K.W. rejoining sports if he received a "internal cardiac defibrillator." (Id. ¶ 80). On October 31, 2018, plaintiff K.W. made it through the first series of "cuts" and revealed this to his father, who was previously unaware of his son trying out. (Id. ¶¶ 81-82). Plaintiff K.W. requested that he be allowed to tryout in the final session "just . . . to know that he was 'good enough' to make the team." (Id. ¶ 82). Plaintiff Weaver acquiesced, and plaintiff K.W. was allowed on the team, although he informed the coach that he could not accept the position.

Defendant's athletic director reached out to plaintiff Weaver to let him know that plaintiff K.W. could not play, with which plaintiff Weaver concurred, although he shared the possibility of the internal cardiac defibrillator. While nothing was communicated to plaintiff Weaver at that time and no measures were taken against plaintiff Weaver, a school nurse had informed defendant's administrative personnel of her concerns regarding plaintiff K.W. playing despite medical advice to the contrary. The then-head of the upper-school indicated to that nurse that he would review the situation, and plaintiffs allege that defendant's administration was generally aware of "the facts surrounding the basketball tryouts" at that time. (Id. ¶ 89).

On February 15, 2019, plaintiff Weaver was offered a contract for the 2019-2020 school year, which he accepted by signing and returning it to Ehrhardt's office on February 28, 2019.

In the wake of plaintiff Weaver's contract renewal in spring of 2019, plaintiff K.W. was assigned to attend a foreign exchange program in Pilar, Argentina, for which the family had obtained a passport for plaintiff K.W. in anticipation. As part of the program, before plaintiff K.W.

6

left for Argentina, plaintiffs hosted an exchange student, which all foreign exchange program participants were "expected" to do "in return for the opportunity." (Id. ¶ 98). Plaintiffs moved to a larger home, in part, to host the student and purchased certain materials in order to properly host the student, which they allege they would not have done if plaintiff K.W. was not planning on attending the foreign exchange trip.

The program purported that "exchange coordinators will work with families of students with disabilities . . . to discuss what types of accommodation are available . . . and to determine whether the student's needs can be met in a way that allows him or her to have a safe and positive experience abroad." (Id. ¶ 92). The coordinator for the Pilar exchange program and relevant school administrator "indicated that [plaintiff] K.W. could safely travel to Argentina and allowed his participation in the exchange program." (Id. ¶ 94). Defendant's nurse indicated that an automatic electronic defibrillator ("AED") could be sent along with plaintiff K.W. on the trip and that the faculty chaperones could be trained to use it.

However, on April 16, 2019, plaintiff Weaver received an email requesting a meeting based on plaintiff K.W.'s "medical flag." (Id. ¶ 100). Two days later, plaintiff Weaver was informed that his son would not be permitted to travel due to the purportedly arduous nature of the trip and lack of AEDs in the places to which the students would travel. Plaintiff Weaver asked if an AED could be sent with his son but was told it could not. Plaintiff Weaver had personal knowledge of "other non-Black students who had had medical conditions" and "been allowed to participate in foreign exchange trips." (Id. ¶ 105).

Plaintiff Weaver, by chance, ran into Ehrhardt after learning of this decision. Plaintiff Weaver shared the details of the discussion he had just had. Ehrhardt informed plaintiff Weaver that plaintiff K.W.'s "basketball tryout . . . was [the] rationale for the school's decision." (Id. ¶

113). Ehrhardt recounted that another student had become ill during an exchange trip the previous year, which he explained further necessitated "the school's cautious approach with students having a medical occurrence/need so far from home." (Id. ¶ 116). Plaintiffs were upset and hurt by plaintiff K.W.'s exclusion from the trip.

Plaintiff Weaver sought an official letter on this decision and defendant's decision-making process. Plaintiff Weaver was informed by Ehrhardt, in an email copying defendant's human resources director and chief financial officer, that the two had much to discuss and that they would talk soon.

On May 3, 2019, plaintiff Weaver met with Ehrhardt and defendant's chief financial officer. Plaintiff Weaver was informed that he had failed to turn in a permission form related to the trip in a timely manner, despite the fact that others had also turned their forms in late. However, Ehrhardt explained that defendant would have allowed him to turn in the form late. The conversation turned "antagonistic," with both parties accusing the other of wrongful conduct. (See id. ¶¶ 122-24, 128-35). Ehrhardt informed plaintiff Weaver that "he was considering termination of [p]laintiff Weaver and rescinding the contract that was offered and signed 3 months earlier." (Id. ¶ 136). Around this time, the stress and disappointment regarding his exclusion from the trip caused plaintiff K.W. to have "a meltdown that necessitated his being taken . . . to Wake Med Children's Hospital for a psychological assessment." (Id. ¶ 137).

Plaintiff Weaver, Ehrhardt, and defendant's chief financial officer met again on May 10, 2019. Ehrhardt informed plaintiff Weaver that defendant had decided "to 'end [plaintiff Weaver's] relationship with Cary Academy.'" (Id. ¶ 142). Ehrhardt explained that he had reflected on "this 'episode,'" and that this was the correct result based on similar situations prior. (Id.). Ehrhardt took issue with plaintiff Weaver's purported "breach" of "the 'safety and well-being of their

8

students,'" by allowing his son to try out for basketball. (Id. ¶ 144-45). Ehrhardt also stated that plaintiff Weaver did not have "a stellar and perfect track record around meeting professional obligations." (Id. ¶ 144). The "smooth path for [plaintiff] Weaver's exit was revocation of the offer letter . . . but not an immediate termination" along with the possibility of completing "summer work." (Id. ¶¶ 146-47). Plaintiff Weaver was offered a severance agreement, and plaintiff K.W. would be allowed to continue at the school.

Plaintiff's termination letter stated that the February 18, 2019, contract offer was rescinded "after 'reviewing [plaintiff Weaver's] professional conduct regarding the health and safety of a student this academic year, and considering previous incidents involving general disregard for school protocol and policies." (Id. ¶ 150). The letter described plaintiff Weaver's conduct as "gross malfeasance as it pertain[ed] to [his] duty of care and professional responsibilities" and focused on plaintiff Weaver's allowing his son to try out for the basketball team "despite his serious medical condition that could have resulted in his immediate death." (Id. ¶ 151). Plaintiff Weaver alleges, in contrast to the assertion of prior incidents involving general disregard for school protocols and policies and a lack of care for student safety, he had been "given multiple responsibilities which involved his being entrusted with the safety of Cary Academy students." (Id. ¶ 153).

On June 8, 2019, after his alleged termination, plaintiff Weaver applied to a similar position as a science teacher at another school in Raleigh, North Carolina. Plaintiff Weaver was familiar with the teacher who was leaving the position and was informed by that individual that plaintiff Weaver would be a good fit. However, Ehrhardt's negative remarks to the new school's principal regarding plaintiff Weaver resulted in the school not considering hiring him.

Additional alleged facts pertinent to the motion will be discussed in the analysis below.

9

# COURT'S DISCUSSION

A.     Standard of Review

The court is guided by the principles of review set forth in its prior order.  (Sept. 27, 2021,

Order (DE 29) at 9).

B.     Analysis

1.     Plaintiff Weaver's Title VII and § 1981 Claims

In considering whether the complaint sufficiently states a claim by plaintiff Weaver under

Title VII or § 1981,[3] the court's analysis properly focuses on insufficiencies identified in its prior

order and whether plaintiffs' additional factual allegations cure those insufficiencies.  Plaintiff

Weaver's Title VII claim previously was dismissed due to failure to timely file an Equal

Employment Opportunity Commission ("EEOC") charge, based on the information provided by

the parties.  (Sept. 27, 2021, Order (DE 29) at 10-11).  By contrast, plaintiff Weaver's § 1981 claim

was dismissed for failure to plead sufficient facts to make his claim of racial discrimination

plausible under Rule 12(b)(6)'s standard.  (Id. at 13).  Defendant concedes that, on plaintiffs'

additional factual allegations, "[p]laintiff Weaver's EEOC charge was timely filed," but contends

that the complaint fails to plausibly allege a claim under Title VII or § 1981.  (Def.'s Mem. (DE

45) at 2).

a.     Wrongful Termination

A plaintiff's termination may be wrongful, and therefore actionable under Title VII and §

1981, if it is based on racial animus, 42 U.S.C. §§ 1981, 2000e-2, or if it constitutes retaliation for

---

[3]        Per the court's analysis in prior order, Title VII and § 1981 rely, in large part, on similar, relevant standards,
and thus the court analyzes plaintiff Weaver's claim under each statute in conjunction.  (See Sept. 27, 2021, Order
(DE 29) at 12).

a plaintiff's complaints about practices the relevant statute makes unlawful. Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 281-2 (4th Cir. 2015).[4]

### i. Racial Animus

The court previously held that plaintiffs' complaint lacked the requisite factual allegations to raise a reasonable inference that plaintiff Weaver's termination was racially based. While certain factual allegations were consistent with discriminatory intent by decisionmakers, they, standing alone, were insufficient to plausibly suggest any relevant agent of defendant's discriminatory state of mind. (Sept. 27, 2021, Order (DE 29) at 13). Plaintiffs have remedied that through additional factual allegations that allow the reasonable inference that plaintiff Weaver's contract with defendant was terminated because of his race and which provide a plausible basis to conclude that other facially non-discriminatory acts were, in fact, fueled by racial bias.

For example, plaintiff Weaver now alleges Ehrhardt's failure to support or defend him in the face of disrespect from a parent, in the form of the pick-up line incident, stands in contrast to instances where plaintiff Weaver personally observed Ehrhardt "support and defend white teachers who were treated with disrespect by parents." (Compl. ¶ 32; compare Sept. 27, 2021, Order (DE 29) at 14 (explaining that plaintiffs had "not alleged facts raising the reasonable inference that similar complaints by non-black teachers were handled by Ehrhardt" differently)). Similarly, plaintiffs' additional factual allegations detail that not only was plaintiff Weaver "the first Black Cary Academy recipient of" the Leadership in Teaching Award, but that he was also the first Cary Academy teacher to have his accomplishment ignored by defendant's administration unlike the treatment that previous winners that were white had received. (Compl. ¶¶ 39-41; compare Sept. 27, 2021, Order (DE 29) at 14 ("[T]he complaint does not allege that these other teachers were,

---

[4]      Throughout this order, internal citations and quotation marks are omitted from citations unless otherwise specified.

for example, all white or other similar facts that would even begin to support a reasonable inference that the distinction made between plaintiff Weaver's achievement and those of his predecessors was a racial one.")).  These are joined by other allegations of discrete events that, taken in the light most favorable to plaintiffs and treated as true, plausibly evidence a "general pattern of racial discrimination in the practices of . . . defendant" such as allows an "infer[ence] [of] discriminatory intent."  Woods v. City of Greensboro, 855 F.3d 639, 649 (4th Cir. 2017); (see, e.g., Compl. ¶¶ 21, 43-44, 47-49, 59).

As the court previously explained, an alleged pretextual reason — that is, a false one advanced to hide the actual reason — for a firing must still present, and be joined by facts supporting, a plausible basis that the firing was because of race or some other impermissible reason.  (Sept. 27, 2021, Order (DE 29) at 16-17); see also Warmington v. Bd. of Regents of Univ. of Minn., 998 F.3d 789, 798-99 (8th Cir. 2021) ("[T]he allegation that the misconduct allegations against her were pretextual does not plausibly allege that [plaintiff's] sex was a motivating factor in the decision to terminate her.").  However, plaintiffs have now provided additional factual enhancement in the light of which the alleged pretext must be viewed.  Taken in whole, these new allegations provide the requisite plausible basis that not only was plaintiff Weaver's firing based on a pretextual reason but that it was pretext for racial bias, that is, he was fired because of his race.

In sum, plaintiffs have remedied the factual insufficiencies in their previous complaint identified by the court.  As amended, the complaint states a claim to relief for a racially discriminatory termination, actionable under Title VII or § 1981, that is plausible on its face.

Defendant, in arguing to the contrary, relies in part on the complaint's "express[] detail[ing] [of] the legitimate non-discriminatory reasons for [defendant's] actions."  (Def.'s Mem. (DE 45)

at 2).  Defendant urges that plaintiffs, by providing the allegedly pretextual reason they were given for plaintiff Weaver's firing, have pleaded themselves out of a case.  It relies on <u>Bing v. Brivo Systems, LLC</u>, 959 F.3d 605 (4th Cir. 2020), and <u>Ali v. BC Architects Engineers, PLC</u>, 832 F. App'x 167 (4th Cir. 2020), in support.

The cited statements from <u>Bing</u>, 959 at 617 ("Bing specifically alleged a non-racial reason for the termination."), and <u>Ali</u>, 832 F. App'x at 171 ("Ali specifically alleged that [defendant] did not want her working as a structural engineer for an entirely non-discriminatory reason[.]"), must be understood in light of the paucity of factual allegations otherwise supporting a discriminatory reason for the adverse actions against those plaintiffs and in light of <u>Ashcroft v. Iqbal</u>'s guidance on "obvious alternative explanation[s]."  556 U.S. 662, 682 (2009).  As explained in <u>Woods</u>, a defendant's explanation for an adverse action taken against the plaintiff may "render [plaintiff's] allegations implausible" in comparison.  855 F.3d at 649; <u>see also</u> <u>Iqbal</u>, 556 U.S. at 682 ("As between that obvious alternative explanation for the arrests, and the purposeful, invidious discrimination [plaintiff] asks us to infer, discrimination is not a plausible conclusion.").

However, as in <u>Woods</u>, defendant's proffered reason for plaintiff Weaver's termination, "failure to protect a student from a recognized serious harm" by allowing his son to try-out for basketball with hypertrophic cardiomyopathy, is not "so obviously an irrefutably sound and unambiguously nondiscriminatory and non-pretextual explanation that it renders [plaintiffs'] claim of pretext implausible." <u>Woods</u>, 855 F.3d at 649.  On the complaint, defendant knew of plaintiff Weaver's conduct months before his firing and, in fact, afterwards offered him a new contract and additional opportunities involving the responsibility for the "safety of Cary Academy students." (Compl. ¶¶ 85, 89, 126-29).

For these reasons, defendant's motion to dismiss as to plaintiff Weaver's Title VII and § 1981 claims for his termination is denied.[5]

ii.    Retaliation

To state a claim for retaliation, a plaintiff must allege that she "[1] engaged in protected activity, [2] that [her] employer took an adverse employment action against [her], and that [3] there was a causal link between those events." Savage v. Maryland, 896 F.3d 260, 276 (4th Cir. 2018). To be actionable as Title VII or § 1981 retaliation, the activity for which a plaintiff was fired either must have been protected by the relevant statute or reasonably thought to be so by plaintiff. See Boyer-Liberto, 786 F.3d at 281-82. For Title VII, as pertinent here, this must be plaintiff's opposition to "any practice made an unlawful employment practice." 42 U.S.C. § 2000e-3(a) (emphasis added); DeMasters v. Carilion Clinic, 796 F.3d 409, 417 (4th Cir. 2015) ("[O]ppositional activity must be directed to 'an unlawful employment practice.'"). For § 1981, this must be opposing the conduct made illegal under § 1981: interference with any person's "right . . . to make and enforce contracts . . . as is enjoyed by white citizens" or vindication of that right. 42 U.S.C. § 1981(a); see CBOCS W., Inc. v. Humphries, 553 U.S. 442, 452 (2008) (holding that § 1981's protection extends to an individual who attempts to secure another's rights under the statute); Ali, 832 F. App'x at 172 ("Section 1981 encompasses retaliation claims for opposing race discrimination in employment.").

---

[5]    While a negative reference regarding a former employee may constitute an adverse action for the purposes of Title VII's retaliation provisions, see Robinson v. Shell Oil Co., 519 U.S. 337, 339 (1997), the "scope of actions that qualify as an adverse action . . . differ[s]" for unlawful discrimination claims. Laird v. Fairfax County, 978 F.3d 887, 893 (4th Cir. 2020) (emphasis omitted) ("For a discrimination claim, the plaintiff must show that her employer took an action that adversely 'affect[ed] employment or alter[ed] the conditions of the workplace.'" (alterations in original) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 62 (2006))). Accordingly, the court does not address, in this part, the plausibility of any racial animus motivating Ehrhardt's alleged negative references regarding plaintiff Weaver, post-employment.

14

"An employee opposes race discrimination [in employment] when she communicates to her employer a belief that the employer has engaged in such discrimination." Ali, 832 F. App'x at 172; Boyer-Liberto, 786 F.3d at 281 ("Employees engage in protected oppositional activity when, inter alia, they complain to their superiors about suspected violations of Title VII.").

Here, the complaint does not reveal that plaintiff Weaver engaged in any activity protected by either statute, and plaintiffs' response to the instant motion fails to identify with any degree of specificity any protected activity. (See, e.g., Pls.' Resp. (DE 46) at 6 (asserting that the events described in the complaint constitute "plausible, nonspeculative evidence that complaint or even just mentions of these incidents would result in retaliation")). Although their complaint alleges that "[p]laintiff [Weaver] opposed [d]efendant's exclusion of his son from the foreign exchange program based on race," (Compl. ¶ 175), it fails to include any factual allegation that defendant's decisionmakers knew or had been told plaintiff Weaver's opposition was based on his belief that defendant was engaged in racial employment discrimination. (See, e.g., Compl. ¶¶ 102-104, 107-108, 115, 120, 130, 133). Further, even accepting that plaintiff Weaver's complaints about alleged racial discrimination by a parent in the pick-up line were protected activity, the complaint fails to plead further factual enhancement to plausibly support a causal link between those activities in February 2016 and November 2017 and his firing in May 2019 or the later negative reference by Ehrhardt.

Defendant's motion is granted in this part. Plaintiff Weaver fails to state a Title VII or § 1981 retaliation claim.

### b. Terms and Conditions of Employment

Plaintiff Weaver separately asserts that defendant racially discriminated against him in relation to the terms and conditions of his employment in violation of § 1981. (Id. ¶¶ 168-173).

15

Specifically, he alleges that as a "faculty member, [p]laintiff [Weaver] was entitled to have his son participate in the foreign exchange program as one of the terms and conditions of his employment." (Id. ¶ 169). Despite this conclusory claim, the complaint fails to raise a reasonable inference that having his son attend the foreign exchange program was a term and condition of his employment with defendant, especially where he also claims he had this right distinctly as a parent of a student and that the right for plaintiff K.W. to attend the trip was separately conditioned on hosting a foreign exchange student. (Id. ¶¶ 169, 203). Plaintiff Weaver's separate claim on this basis is dismissed pursuant to Rule 12(b)(6).

### 2. Plaintiff Weaver's ADA Claim

Plaintiff Weaver's ADA claim was previously dismissed as time barred, but, as with his Title VII claim, plaintiffs' complaint now evidences a timely EEOC charge, as defendant concedes. (Def.'s Mem. (DE 45) at 2).

#### i. Associational Discrimination

Plaintiff Weaver's ADA claim is not based on any disability of his own, but rather the averred association between him and his son, who is alleged to be disabled within the meaning of the ADA by dint of hypertrophic cardiomyopathy.

Section 12112(b)(4) of the ADA "prohibits employers from taking adverse employment action 'because of the known disability of a person with whom the qualified individual is known to have a relationship or association.'" Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 59 (4th Cir. 1995) (quoting 42 U.S.C. § 12112(b)(4)); see also 29 C.F.R. § 1630.8. "The associational discrimination provision . . . was intended to protect qualified individuals from adverse job actions based on unfounded stereotypes and assumptions arising from the employees' relationships with particular disabled persons." Freilich v. Upper Chesapeake Health, Inc., 313

16

F.3d 205, 215 (4th Cir. 2002). For example, "an employer may not make decisions based on the 'belie[f] that the [employee] would have to miss work' in order to take care of a disabled person." Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal., 31 F.3d 209, 214 (4th Cir. 1994) (alterations in original) (quoting 29 C.F.R. § 1630, App.).

Like other "discharge case[s] brought under the ADA," "a plaintiff must prove by a preponderance of the evidence that (1) she was in the protected class; (2) she was discharged; (3) at the time of the discharge, she was performing her job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination," with the relevant portion of "the ADA's protected class," in this instance, being "those persons who are associated with individuals who are disabled." Ennis, 53 F.3d at 58-59.

Here, plaintiffs' complaint fails to allege facts supporting the essential element of an associational discrimination claim: that plaintiff Weaver's discharge occurred under circumstances that raise a reasonable inference of discrimination based on unfounded stereotypes and assumptions arising from the employee's relationship with a particular disabled person. See Ennis, 53 F.3d at 58-59; Freilich, 313 F.3d at 215. Plaintiff Weaver's claim that his son attending the foreign exchange trip was a term or condition of his employment that was adversely affected on the basis of his son's disability fails for the reasons previously described regarding the extent of the terms and conditions of plaintiff's Weaver's employment. Nor does the complaint plausibly allege that plaintiff Weaver was fired because his son is disabled.

Defendant's motion in this part is granted, and plaintiff Weaver's claim of associational discrimination under the ADA is dismissed.

17

ii.    Retaliation

In addition to prohibiting discrimination against qualified individuals on the basis of disability, "[t]he ADA also prohibits retaliation against employees who seek the Act's statutory protections." Laird v. Fairfax County, 978 F.3d 887, 892 (4th Cir. 2020) (citing 42 U.S.C. § 12203(a)-(b)).  To prove a claim of retaliation under the ADA, a plaintiff must show that "(1) she has engaged in protected conduct; (2) she suffered an adverse action after engaging in the protected conduct; and (3) there was a causal link between the protected conduct and the adverse action." Id. at 892 n.4.  The enumerated examples of protected conduct under the ADA include opposing an act or practice made unlawful by the various subchapters of the ADA.  42 U.S.C. § 12203(a).  Further, "a plaintiff is not required to prove the conduct he opposed was actually an ADA violation. Rather, he must show he had a 'good faith belief' the conduct violated the ADA," Reynolds v. Am. Nat. Red Cross, 701 F.3d 143, 154 (4th Cir. 2012), and one that is "reasonable."  Freilich, 313 F.3d at 216.

Here, plaintiff Weaver has stated a plausible claim of retaliation for his known opposition of conduct he reasonably believed violated the ADA.  See, e.g., DeCotiis v. Whittemore, 842 F. Supp. 2d 354, 369 (D. Me. 2012) (holding that plaintiff had adequately stated a claim for ADA retaliation on the basis of the non-renewal of her employment contract after she "advocated for disabled students who were receiving inadequate public services . . . provided by [her employer] . . . covered under Title II of the ADA").  Title III of the ADA prohibits, in the same chapter as § 12203, discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation," which statutorily includes "a . . . secondary . . . private school[] or other place of education." 42 U.S.C. §§ 12181(7)(l); 12182(a).   Title III enumerates as discriminatory acts,

18

relevant here, 1) "imposition . . . of eligibility criteria that screen out . . . an individual with a disability or any class of individuals with disabilities from full and equally enjoying any. . . services . . . [or] privileges . . . unless such criteria can be shown to be necessary for the provision of the . . . services . . . [or] privileges . . . being offered" and 2) "failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford . . . services . . . [or] privileges . . . to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such . . . services . . . [or] privileges." Id. § 12182(b)(2)(i)-(ii).

Construing the facts alleged in the complaint in the light most favorable to him, plaintiff Weaver reasonably could have believed that defendant's exclusion of his son on the basis of the arduousness of the trip and alleged lack of "adequate availability of automatic electronic defibrillators (AEDs)" was the imposition of an eligibility criterion for the foreign exchange program that tended to screen out a class of individuals with disabilities. (See Compl. ¶¶ 95, 103). He could have also reasonably believed that this criterion was not necessary for the provision of that privilege, given that he had been told that an AED could be sent on the trip and that other students with medical conditions had been allowed to go on foreign exchange trips. (See id. ¶¶ 95, 104-106).

In addition and in the alternative, taking the factual allegations of the complaint as true, plaintiff Weaver could have reasonably thought that defendant had violated the ADA's prohibition on failing to make reasonable modifications in policies, practices, or procedures by refusing to allow plaintiff K.W. to bring an AED on the trip, which, on the complaint, was a necessary modification to allow him to attend that would not fundamentally alter the nature of the trip, given defendant's alleged prior representation to plaintiff Weaver. 42 U.S.C. § 12182(b)(2)(A)(ii); see

J.D. by Doherty v. Colonial Williamsburg Found., 925 F.3d 663, 671 (4th Cir. 2019) (explaining that this section "contemplates three inquiries": "(1) whether the requested modification is 'necessary' for the disabled individual; (2) whether it is 'reasonable'; and (3) whether it would 'fundamentally alter the nature' of the public accommodation" (quoting PGA Tour, Inc. v. Martin, 532 U.S. 661, 683 n.38 (2001))).

Under either theory, plaintiff Weaver, although potentially incorrect,[6] could have "a reasonable, good faith belief that the behavior" of defendant "violate[d] the ADA" as to state a plausible claim for relief for retaliation. Freilich, 313 F.3d at 216 (4th Cir. 2002); see also DeMasters, 796 F.3d at 418 (explaining that, in the Title VII context, "the touchstone is whether plaintiff's conduct as a whole communicates . . . a belief that the [entity] has engaged in . . . a form of [statutorily prohibited] discrimination"). Viewing the factual allegations in the complaint in the light most favorable to plaintiffs, they raise a reasonable inference that plaintiff Weaver adequately put defendant on notice that he was opposing what he viewed as illegal disability discrimination against his son. (See, e.g., Compl. ¶¶ 108, 112, 115-16, 120, 125, 130); see also Hooven-Lewis v. Caldera, 249 F.3d 259, 273 (4th Cir. 2001) ("[Plaintiff's] informal complaints are . . . protected activities if the accused . . . entity knew about them.").

Further, the complaint raises a reasonable inference that plaintiff Weaver's firing and Ehrhardt's negative reference, adverse actions for the purpose of ADA retaliation, were causally linked to plaintiff Weaver's complaints about the treatment of his son. Plaintiffs allege that it was only after plaintiff Weaver complained of the treatment of his son that Ehrhardt brought up the

---

[6]     In its prior order, the court dismissed plaintiff K.W.'s Title III ADA claim because he sought damages that were unavailable under the statutory scheme and his requested injunctive relief was, in large part, premised on his still attending defendant's school at the time of the instant litigation, which was unclear on the complaint. (Sept. 27, 2021, Order (DE 29) at 22-24). However, at the time of plaintiff Weaver's alleged protests, injunctive relief plausibly could have alleviated plaintiff K.W.'s purported harm from a Title III ADA violation, meaning that the fact that the claim ultimately failed does not negate the reasonableness of plaintiff Weaver's alleged belief at the time of his complaints.

long-known basketball tryout incident as a basis for plaintiff's Weaver's termination, despite offering him further employment with knowledge of that event. (Compl. ¶¶ 85, 113, 145). Additionally, as is pertinent to the causal inquiry, plaintiff Weaver's alleged protected activity is temporally proximate to his termination and Ehrhardt's negative reference. See Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 579 (4th Cir. 2015). Less than a month after his initial complaints to Ehrhardt, plaintiff Weaver was informed that his termination was being considered, and a little over a month after that allegedly contentious conversation, Ehrhardt gave a negative employment reference for plaintiff Weaver that prevented him from being hired elsewhere. (Compl. ¶¶ 102, 112, 123, 136, 156, 160); see also Jacobs, 780 F.3d at 579 (explaining that "three weeks" between protected activity and an adverse action constituted "close temporal proximity"). Moreover, Ehrhardt specifically cited their "conversation regarding the trip" as part of why there was much for the two to discuss, which lead to the May 3 meeting during which Ehrhardt first raised the specter of termination. (Compl. ¶ 121).

Defendant's argument in support of dismissal of this claim is inapt where it relies solely on citation of 29 C.F.R. § 1630.12's more limited language. See 29 C.F.R. 1630.12(a) (prohibiting discrimination "against any individual because that individual has opposed any act or practice made unlawful by this part," that is, Part 1630 regarding regulations to implement the equal employment provisions of the ADA). In sum, plaintiffs have alleged sufficient factual support for a plausible claim of retaliation against plaintiff Weaver for his opposing an act he reasonably believed unlawful under the ADA. Defendant's motion is thus denied in this part.

3.      Plaintiffs' State Law Claims

The court previously dismissed plaintiff Weaver's state law breach of contract claim premised on the termination of his express, employment contract. (Sept. 27, 2021, Order (DE 29)

21

at 24-27).  Plaintiffs, after the most recent amendment to their complaint, assert distinct claims of breach of an implied contract between them and defendant, namely, a contract that if plaintiffs "hosted an exchange student, [p]laintiff K.W. would be allowed to participate in the foreign exchange program."  (Compl. ¶¶ 197, 202).

North Carolina law recognizes both contracts implied in law and in fact, although the two arise from distinct legal principles.  Creech v. Melnik, 347 N.C. 520, 526 (1998); Booe v. Shadrick, 322 N.C. 567, 570 (1988).  A contract implied in law, despite the name, "is not a contract," Booe, 322 N.C. at 570, and "is not based on an actual agreement."  Whitfield v. Gilchrist, 348 N.C. 39, 42 (1998).  Accordingly, where the complaint here explicitly states that the claims of implied contract are based on an "agreement" between each plaintiff and defendant, (Compl. ¶¶ 196-207), the court's analysis focuses on whether they adequately state a claim for breach of contract implied in fact.

"[A] contract implied in fact arises where the intent of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts."  Creech, 347 N.C. at 526.  "Except for the method of proving the fact of mutual assent, there is no difference in the legal effect of express contracts and contracts implied in fact."  Id. at 526-27.  Thus, like any contract, a contract implied in fact is not formed unless there is "mutual assent of both parties to the terms of the agreement so as to establish a meeting of the minds."  Snyder v. Freeman, 300 N.C. 204, 218 (1980); see also Putnam v. CIT Small Bus. Lending Corp., 509 F. App'x 195, 196 (4th Cir. 2013) (explaining that the court must "determin[e] whether the relevant parties agreed to reciprocally obligate themselves so as to give rise to an implied contract").  Unlike express contracts, to determine whether there is mutual assent for an implied contract, "one looks not to some express agreement, but to the actions of the parties showing an implied offer and

acceptance." <u>Snyder</u>, 300 N.C. at 218. Regardless, mutual assent for any "valid contract" requires that the "parties' minds . . . meet as to all the terms. If any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement." <u>Chappell v. Roth</u>, 353 N.C. 690, 692 (2001); <u>see also</u> <u>Creech</u>, 347 N.C. at 527 ("When there has been no meeting of the minds on the essentials of an agreement, no contract results.").

Here, although the complaint alleges in conclusory fashion that there was an implied agreement, it lacks the factual enhancement from which the court could reasonably infer such. The complaint describes plaintiffs' one-sided expectation that hosting a foreign exchange student would enable plaintiff K.W. to attend the trip. (<u>See, e.g.</u>, ¶ 98 (describing that trip participants are "expected" to host an exchange student "in return for the <u>opportunity</u>" to participate (emphasis added))). The complaint does not allege any actions by defendant from which it could reasonably be inferred that it had obligated itself to take plaintiff K.W. on the trip to Pilar or that it had agreed that such an obligation was reciprocal or contingent on plaintiffs' hosting of a foreign exchange student. This is evidenced in part by the alleged materials of the foreign exchange program describing students' ability to attend in the trip in conditional language, explaining that "exchange coordinators will work with the families of students with disabilities . . . to determine whether the student's needs can be met in a way that allows him or her to have a safe and positive experience abroad." (Compl. ¶ 92).

Plaintiffs fail to state a plausible claim for breach of contract implied in fact, and thus those claims are dismissed.

4.      Plaintiff K.W.'s § 1981 Claim

The court previously dismissed plaintiff K.W.'s § 1981 claim for failure to allege a relevant, actual or potential contractual relationship between plaintiff K.W. and defendant.  (Sept. 27, 2021, Order (DE 29) at 19-20).

As the court previously explained, a § 1981 action must be founded on purposeful, racially discriminatory actions that affect at least one of the contractual aspects listed in § 1981(b), which include the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.  (Sept. 27, Order (DE 29) at 19).  To remedy the insufficiency identified in the prior version of their complaint, plaintiffs now rely on the alleged implied contract between plaintiff K.W. and defendant regarding hosting a foreign exchange student as the relevant contractual relationship.  However, for the reasons identified above, the complaint fails to plausibly allege such a relationship.

Therefore, plaintiff K.W.'s § 1981 claim is not supported by sufficient factual matter in the complaint.  His claim is dismissed.

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss (DE 44) is GRANTED in PART and DENIED in PART.  Plaintiff Weaver's Title VII, § 1981, and ADA claims are allowed to proceed in part as limited herein.  Plaintiffs' remaining claims are DISMISSED.  Where plaintiff K.W. no longer has any active claim against defendant, the clerk is directed to TERMINATE him as a party.

Pursuant to Rule 12(a)(4)(A), defendant's responsive pleading must be served within 14 days of this order.  Where plaintiffs' pleadings have now been framed properly, the court lifts the stay on the parties' scheduling conference activities established January 11, 2021.  After defendant

has served its responsive pleading as required herein, an initial order on planning and scheduling will follow.

SO ORDERED, this the 4th day of April, 2022.

LOUISE W. FLANAGAN
United States District Judge